UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | 89 CR 908-12 |
| WILLIAM DOYLE | Judge Rebecca R. Pallmeyer |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,
United States Attorney for the Northern District of Illinois, hereby responds to
defendant William Doyle's motion for compassionate release pursuant to 18 U.S.C.
§ 3582(c)(1)(A)(i).

Doyle's request should be denied. First, Doyle does not have any medical
conditions that provide "extraordinary and compelling reasons" warranting a
sentence reduction. Doyle's BOP medical records show that he has been taking
routine hypertension medication since 1983, is fully vaccinated against COVID-19,
and has received a booster shot. Second, Doyle's claim that he is entitled to relief
because of a sentencing disparity is meritless. And finally, Doyle is serving a natural
life sentence under the Sentencing Guidelines after having been convicted of
racketeering, racketeering conspiracy, and narcotics conspiracy, including special
verdicts finding that he personally murdered two innocent young girls, personally
shot and attempted to kill three other victims, and conspired to commit at least half-
a-dozen additional murders. Based on Doyle's offenses of conviction and criminal

history, which includes an additional murder in Illinois, a sentence reduction would be inconsistent with the relevant policy statement and pertinent § 3553(a) factors.

## I. Procedural History[1]

Defendant William Doyle was charged with 37 other leaders and members of the El Rukn street gang in a 175-page indictment returned on October 26, 1989, *United States v. Henry Andrews et al.*, 89 CR 908. On the same date, 27 other El Rukn gang members were charged in a companion indictment, *United States v. Michael Anderson et al.*, 89 CR 909. Defendants charged in one indictment were named as unindicted coconspirators in the other indictment. The offenses and predicate acts charged included racketeering in violation of 18 U.S.C. § 1962(c); racketeering conspiracy in violation of 18 U.S.C. § 1962(d); narcotics conspiracy in violation of 21 U.S.C. § 846; narcotics distribution in violation of 21 U.S.C. § 841(a)(1); murder, attempted murder, and murder conspiracies in violation of 18 U.S.C. § 1952A (now § 1958) and § 1952B (now § 1959); and witness intimidation and retaliation in violation of 18 U.S.C. §§ 1512 and 1513.

Two superseding indictments were filed in *Andrews*. Doyle was charged in three counts of the second superseding indictment. Count One charged Racketeering conspiracy (18 U.S.C. § 1962(d)); Count Two charged Racketeering (18 U.S.C. § 1962(c)); and Count Three charged Narcotics Conspiracy (21 U.S.C. § 846). As part of

---

[1] The Procedural History and Offense Conduct sections of this Response are derived from the Presentence Report (PSR) prepared by the Probation Office following Doyle's conviction in his 1995 retrial before Judge Suzanne Conlon, which is filed under seal as Exhibit 1 to this Response and bates stamped as "Doyle PSR 001-151," including the Government's Version of the Offense attached to that PSR. *See* Exhibit 1 at 10-16; 67-92.

Count Two, Doyle was charged with the following eleven predicate acts of murder, attempted murder, conspiracy to murder, and narcotics offenses:

- Racketeering Act No. 5: Conspiracy to Murder Audriana Thomas;

- Racketeering Act No. 6: Murder of Rowena James;

- Racketeering Act No. 9: Conspiracy to Murder Members of the Titanic Stones;

- Racketeering Act No. 10: Murder of Willie Bibbs;

- Racketeering Act No. 13: Murder of Charmaine Nathan and Attempted Murder of Duke Thomas and Sheila Jackson;

- Racketeering Act No. 14: Conspiracy to Murder Chalmers Tyler;

- Racketeering Act No. 15: Conspiracy to Murder Melvin and Jerry Ewing;

- Racketeering Act No. 16: Attempted Murder of Jerry Little and Phillip Steele;

- Racketeering Act No. 31: Narcotics Conspiracy as charged in Count Three;

- Racketeering Act No. 32: Interstate travel in aid of racketeering relating to the April 5, 1983 distribution of cocaine in exchange for marijuana in Tupelo, Mississippi; and

- Racketeering Act No. 33: Possession with intent to distribute 200 grams of cocaine on April 5, 1983, in Tupelo, Mississippi.

Judge Aspen severed the *Andrews* indictment into five separate trials. The second of these trials involved defendants Doyle and codefendants Hank Andrews, George Carter, J.L. Houston, and Derrick Porter, and was conducted by Judge Suzanne Conlon beginning July 8, 1991. Before the trial concluded, the Court granted Houston's motion to sever based upon ineffective assistance of counsel and dismissed charges against Porter pursuant to Rule 29 of the Federal Rules of Criminal Procedure. After deliberating for several days, on August 29, 1991 the jury returned

guilty verdicts against Doyle, Andrews, and Carter. Doyle was convicted on all three counts, including nine Racketeering Acts. The jury found Doyle not guilty only on Racketeering Acts 10 (Murder of Willie Bibbs) and 14 (Conspiracy to Murder Chalmers Tyler).[2] Doyle was granted a new trial and in 1995 was retried on Counts One, Two, and Three and the nine racketeering acts he had been convicted of in his first trial. Doyle was reconvicted on all counts and the jury returned special verdicts finding that he committed all nine racketeering acts. Doyle was sentenced by Judge Conlon to life imprisonment under the Sentencing Guidelines.

## II.    Offense Conduct

### A.  Background

William Doyle was a General in the El Rukn street gang. The El Rukn gang and its predecessor entities constituted a sophisticated and highly structured organization that operated continuously in Chicago from the mid-1960s until the return of the indictments in this case in October 1989. During that time the El Rukns engaged in a wide variety of organized criminal activity, including dozens of murders, murder conspiracies, attempted murders, and aggravated batteries of rival gang members and witnesses, interstate murder-for-hire, kidnappings, witness tampering and retaliation, and the massive distribution of narcotics to finance the Organization's operations and its members' lifestyles.

In the mid-1960s dozens of street gangs operating in the south and west sides

---

[2] Doyle had already been convicted of the Bibbs murder in November 1988 in the Cook County Circuit Court, along with Jeff Fort, Derrick Kees, Derrick Porter, and Ray Ferguson, and sentenced to 55 years' incarceration in the Illinois Department of Corrections (IDOC). *People v. Fort*, 248 Ill. App. 3d 301 (1993).

of Chicago were consolidated under the control of Jeff Fort and Eugene "Bull" Hairston. From 1963 through 1968, the Organization was known as the "Blackstone Rangers." From 1968 through early 1976, the Organization was known as the "Black P Stone Nation." Fort and Hairston ran the Organization through a group known as the "Main 21," which consisted of 21 gang leaders personally selected by Fort and Hairston who had merged their own smaller gangs into the Organization. The combined membership of these gangs was in the thousands. Meetings of the Organization were held weekly during the 1960s and early 1970s, usually at the First Presbyterian Church at the corner of East 64th Street and S. Kimbark Avenue which Pastor John Fry allowed the Blackstone Rangers to use as a gang headquarters for years during the mid-to-late 1960s. One of the gangs that operated under the Blackstone Rangers and later the Black P Stone Nation was called the Renegade Pimps, a faction that controlled the territory in the area of 87th and 92nd Streets on the Southside of Chicago. Doyle was a member of the Renegade Pimps. Rudy Bell was the leader of the Renegade Pimps until he was arrested for murder in 1976, which led directly to Doyle's 1977 shotgun murder of a young woman named Rowena James he believed was a witness against Bell, as described below.

In 1976, Fort forced Hairston out and assumed total control over the Organization. Fort changed the name of the Organization to the "El Rukns." The El Rukns purported to be a Muslim religious group, but they were in fact a criminal organization that supported itself through extortion and narcotics trafficking and sought to insulate its criminal activities behind a religious facade. Fort replaced the

Main 21 with Generals and a subordinate rank originally called the Enforcers. Doyle became an Enforcer in the organization, along with Earl Hawkins, Harry Evans, Henry Harris, Trammel Davis, Jackie Clay, Derrick Kees, Hank Andrews, George Carter, and Anthony Sumner, whose job was to enforce the rules of the organization and to combat its rivals. The methods employed by the Enforcers included murder, shootings, beatings, and intimidation. The Enforcers later were renamed the Officers of the Organization and a number of Officers became known as "Riders" beginning in the late 1970s. The term Rider referred to a picture in Jeff Fort's office depicting a black-hooded knight carrying a bloody sword. The Riders acted as hitmen for Jeff Fort and the Organization, killing those whom Fort perceived to be enemies. Among the Riders were Doyle, Earl Hawkins, Jackie Clay, Derrick Kees, Harry Evans, Ray Ferguson, and Anthony Sumner.

The headquarters for the Organization was a 1920s movie palace and storefront complex that took up an entire block at 3947 South Drexel Boulevard, across the street from the Ida B. Wells housing projects. The El Rukns converted this complex into an armed fortress called the Fort. After a raid by the Chicago Police Department in 1978 the original wooden door was replaced with a steel door having a continuous hinge and no handle on the outside, making it extremely difficult for the CPD to obtain entrance. A small window on the north wall of the second floor allowed El Rukn members to control access to the Fort and to guard against raids by the CPD. The offices of the Organization were located on the second floor, which held a large ballroom and numerous offices. In these rooms the Organization held weekly

meetings of the Generals, Officers, and a third rank called Ambassadors formed below the Officers in approximately 1983. This group collectively was known as the "Government." The Generals alone comprised the "Royal Council" while the Generals and Officers formed the "Council." In the late 1970s and the early 1980s, the Government met weekly. At all government meetings, Jeff Fort and other El Rukn leaders discussed the business of the organization, which was drug trafficking, property management, and disputes with other street gangs. Royal Council meetings discussed and approved murders and retaliation against rival gangs and gang members engaged in disputes with Fort and the Organization. For many years, Doyle participated in these weekly meetings.

During the 1970s and 1980s, the El Rukns also acquired numerous large apartment buildings in a concentrated area of the Woodlawn neighborhood. Among these were the "Alahambra" at 6417 South Kenwood, a building with approximately 100 apartments that the organization acquired control of by force on August 7, 1980. Before that time George "Duke" Thomas had run the building and sold narcotics from the location. This takeover led in part to the efforts to kill Thomas and Doyle's murder of Charmaine Nathan, an innocent girl, as described below. Other buildings owned by the Organization were the "African Hut" at 6416 South Kenwood; the "Pyramid Towers" at 6400 South Woodlawn; the "Morocco" at 6410 South Minerva; the "East Side" at 7611-23 South Kingston; the "Harper Building" at 6435 South Harper; the "Peace and Love Building" at 7427-57 South Kingston; and the "Five Points Terrace" at 4559-67 to 4601-01 South Woodlawn. Hundreds of El Rukn gang members lived in

these buildings with their families, and armed members controlled access and sold drugs at the entrances. Doyle and other Officers regularly performed "security" at these El Rukn-owned buildings. Security involved controlling access to the buildings and selling cocaine and marijuana to people who came to the door. Members on security were always armed, usually with both a handgun and a shotgun. When the rank of Ambassador was created, those members took over most responsibility for security duty. Marijuana and cocaine were sold out of El Rukn buildings every day through the 1980s.

Between 1976 and when he first went to federal prison for narcotics dealing in 1983, Doyle played a role in obtaining weapons for the Organization. Because Doyle had an Illinois Firearms Owner's Identification Card, he was able to purchase handguns, rifles, and shotguns from Shore Galleries and Chuck's Dolton, two gun shops in the Chicago area. Four guns purchased by Doyle between 1976 and 1978 were later recovered by law enforcement from El Rukns:

1.  An Ithaca pump shotgun recovered from El Rukn General Alan Knox on July 12, 1979.

2.  A Super .38 semiautomatic handgun recovered from El Rukn Soldier Roderick Haygood at the Peace and Love Building on December 14, 1981.

3.  A Super .38 semiautomatic handgun and a quantity of marijuana recovered from Jeff Fort's apartment at the Alahambra on February 5, 1982.

4.  A .44 magnum revolver recovered on August 6, 1986 in the basement of the African Hut where Trammel Davis was then living. Recovered with this handgun were 35 other weapons, including a Mac submachinegun, fragmentation hand grenades, and a LAW anti-tank rocket that the FBI sold to the El Rukns in a sting operation.

Communication among members of the El Rukn Organization was accomplished through a detailed language of code words. Numbers in particular were coded to disguise the fact that El Rukns, on the telephone and elsewhere, were planning and conducting narcotics transactions with each other and others. Other code words were utilized to discuss murders or other crimes in furtherance of the racketeering enterprise. This code helped the El Rukns prevent detection by law enforcement and helped Jeff Fort run the Organization from federal prison after he and defendant Doyle were convicted for drug trafficking in Mississippi 1983. By then Jeff Fort referred to Doyle, then a General, as his "right arm" during the Mississippi marijuana negotiations described below.

### B. Doyle's Role in Drug Trafficking

Between 1975 and when he was arrested in Mississippi for drug trafficking in April 1983, Doyle was intimately involved with the El Rukn Organization's sale of marijuana, cocaine, Talwin and Triphenamine ("Ts and Blues"), and codeine syrup. When he returned from prison in 1986, Doyle resumed his role and was in charge of mixing and distributing cocaine, heroin, and marijuana. Marijuana is a Schedule I Controlled Substance, cocaine is a Schedule II Controlled Substance, Ts and Blues are a Schedule IV Controlled Substance and codeine syrup is a Schedule V Controlled Substance. Ts and Blues became a controlled substance in 1979. Some portion of all narcotics sales, including those by Doyle, was returned to the El Rukn organization. Profits from marijuana and cocaine sales while on security duty at El Rukn buildings were devoted exclusively to the organization.

### 1.  Ts and Blues and Codeine Syrup

Between 1975 and 1983, Doyle was personally involved in distributing Ts and Blues, codeine syrup, and marijuana in the area immediately surrounding the Fort. Among the people who sold these narcotics with Doyle were Earl Hawkins and Trammel Davis. The drug trade in that area was controlled by El Rukn General Alan Knox, also known as General Gangs. Alan Knox determined how much each El Rukn was allowed to sell each day, thereby permitting each to share in the profits.

In 1979, Jeff Fort ordered that Doyle and other El Rukns who sold Ts and Blues stop selling them directly. From that time forward, El Rukns sold Ts and Blues through drug addicts whom they paid to distribute the drugs. Doyle was also partly responsible for obtaining Ts and Blues for distribution by the El Rukns. In the late 1970s the source of these pills was a group called the "Bobos" in Detroit, Michigan. El Rukns Anthony Sumner and J. L. Houston knew the Bobos and travelled to Detroit regularly to purchase Ts and Blues for the Organization. On each of these trips, Sumner or Houston was accompanied by one or more other El Rukns. On at least five occasions Doyle made the trip. When Doyle was on the trip, Jeff Fort placed him in charge of taking the money to Detroit and bringing back the pills.

### 2.  Marijuana

Doyle sold marijuana and managed marijuana trafficking for the El Rukns from the 1970s through 1988. Beginning in 1978, the El Rukns obtained duffle bags full of marijuana regularly from a source in Florida. Doyle was responsible for tracking the progress of these trips on a map. These duffle bags arrived

approximately once every two weeks and contained 20 to 40 pounds of marijuana. Ervin Lee and other El Rukns cut and bagged marijuana in apartment 302 of the Alahambra beginning in 1980. Nine times out of ten the duffle bags containing the marijuana were brought to the apartment by Doyle.

### 3.    Cocaine

The El Rukn Organization began selling cocaine in approximately 1980. From the beginning, Doyle was one of the El Rukn leaders in charge of mixing and distributing cocaine. Doyle and Henry Harris often mixed kilogram quantities of cocaine on the second floor of the Fort and packaged it for resale. These packages of cocaine typically contained 1/2 gram and one gram quantities. Generals and Officers, including Doyle, would then distribute the cocaine in street sale quantities to El Rukn Soldiers at the Fort and money from the sales was then returned to Doyle.

In the Spring of 1983 Jeff Fort sent Doyle and Officer Henry Timothy to Tupelo, Mississippi, in an attempt to purchase 100 pounds of marijuana in exchange for cash and cocaine.  Unknown to the El Rukns, the seller was an agent with the Mississippi Bureau of Narcotics.  In recorded telephone calls planning the deal and preceding the trip, Fort referred to Doyle as his "brother" and his "right arm." When Doyle and Timothy arrived in Mississippi, they were arrested by Mississippi law enforcement. Doyle and Timothy had with them 200 grams of cocaine and $18,750 cash they intended to exchange for the 100 pounds of marijuana. Doyle, Timothy, and Fort subsequently pleaded guilty to state and federal charges. The jury in this case returned special verdicts finding Dole guilty of Racketeering Act 32, interstate travel

in aid of racketeering, and Racketeering Act 33, possession with intent to deliver 200 grams of cocaine, for the April 5, 1983 trip to Mississippi.

From April 1983 until the summer of 1986, Doyle remained incarcerated on the Mississippi state and federal convictions in federal prison. Doyle remained involved closely with the workings of the El Rukns during his incarceration. El Rukns at the Fort spoke to Doyle frequently on the telephone, sometimes using the personal telephone line reserved for calls from Jeff Fort, who was also incarcerated on those charges in federal prison in Bastrop, Texas, and continued to run the day-to-day affairs of the Organization through daily telephone calls of up to 6 hours per day.[3]

### 4. Heroin

The El Rukn Organization began selling heroin in 1984 while Doyle was in prison. The primary sources for this heroin were Noah Robinson and Alexander "Ghost" Cooper. Jeff Fort formed a group within the El Rukns known as the "Gorilla Family" to sell the heroin to try and conceal the fact that the Organization had gone into the retail heroin trade on Chicago's streets. By the summer of 1986, Doyle had returned to the Metropolitan Correctional Center in Chicago. He was released from the MCC daily and El Rukn Ervin Lee picked him up at the MCC and drove him either to the Fort or to Doyle's home on the Southside. When Doyle was release from prison, he directed the amounts of heroin that would be mixed in the Fort at any given time and controlled the distribution of that heroin to El Rukn soldiers for retail

---

[3] Thousands of hours of telephone conversations between Fort in federal prison in Texas and the El Rukns running the Organization at his direction in Chicago were recorded in December 1985 and April through August 1986 pursuant to court-ordered Title III wiretaps on the prison and the Fort. Dozens of these calls were played at the El Rukn RICO trials.

resale in dime bags. Jeff Fort, who was still in prison at the time, instructed the other members of the Organization that Doyle was in charge of all El Rukn operations and had "last word" in Chicago. This authority specifically extended to the El Rukns' drug operations. Doyle directed the other daily affairs of the El Rukns as well, including beatings of other members for punishment or disciplinary purposes. Doyle remained in charge of the El Rukn Organization until he was convicted and jailed in November 1988 in the Circuit Court of Cook County with codefendants Jeff Fort, Derrick Kees, Ray Ferguson, and Derrick Porter for the 1981 murder of Willie Bibbs described below.

As the leader of the El Rukns in Chicago, Doyle spoke twice by telephone to jailed El Rukn General Eugene Hunter in July 1988. Hunter was in jail in South Carolina on charges that he participated in the interstate murder-for-hire of Leroy "Hambone" Barber. This murder was committed by an El Rukn hit team on January 2, 1986 in Greenville, South Carolina, in exchange for $10,000 from Noah Robinson. In these consensually-recorded telephone calls, Doyle told Hunter that the Organization would send Hunter an attorney and not to cooperate against Noah Robinson.

Based on the forgoing activity, the jury in this case returned a special verdict finding Doyle guilty of Racketeering Act 31, Narcotics Conspiracy, and a verdict of guilty of the same Narcotics Conspiracy charged in Count Three.

### C. Doyle's Murders, Attempted Murders, and Murder Conspiracies

Doyle was an integral member of the El Rukn hit team from 1977 until his arrest in Mississippi in April 1983. He committed numerous murders, attempted murders, and participated in conspiracies to murder at Jeff Fort's direction. The jury returned special verdicts convicting him of the following racketeering acts of murder, attempted murder, and murder conspiracies:

- **Racketeering Act No. 5: The Conspiracy to Murder Audriana Thomas**

- **Racketeering Act No. 6: The Murder of Rowena James**

On September 1, 1977, William Doyle fired two shotgun blasts into the head of Rowena James while she was sitting in her car at a stop light at 98th St. and S. Wentworth. Doyle committed this murder believing that James was her sister, Audriana Thomas, a witness against El Rukn leaders Rudy Bell and Orville Miller in a state murder case.

The murder of Rowena James arose out of a gang war between the Renegade Pimps and the Outlaw Disciples. Doyle, Orville Miller, Derrick Kees, Hank Andrews, George Carter, Teddy Parrish, and Freddie Cooper were among the members of this El Rukn faction led by Rudy Bell. In 1977 the Renegade Pimps controlled the area between 87th and 92nd Streets in Chicago. Bell and Miller were charged with the shooting death of Outlaw Disciple Tyrone Smith. Audriana Thomas was an eyewitness who knew and identified both Bell and Miller and was the State's key witness. Doyle and other El Rukns attended preliminary court hearings on the case at Jeff Fort's direction. In early August 1977, El Rukn Derrick Porter obtained a copy

14

of the police report from corrupt El Rukn lawyer William Swano which identified Audriana Thomas as the eyewitness and detailed her account of the shooting. Jeff Fort passed the police report around to the Officers and Generals present, including Doyle, and they discussed how to locate Thomas. Doyle, Kees, Carter, and Andrews indicated that they knew Thomas and where she lived in the neighborhood. The El Rukns then located and kidnapped Thomas, holding her at the Crest Hotel at 67th Street and Stoney Island Boulevard. Thomas escaped, however, and the State's Attorney's Office hid her out in a motel in Elgin. When it was apparent she was still going to testify against Rudy Bell and Orville Miller, Fort ordered her murdered.

Over the next several weeks, El Rukn hit teams tried to re-locate Thomas to set up her murder. As part of this effort, Doyle, Earl Hawkins, Derrick Kees, Hank Andrews, George Carter, Teddy Parrish, and others stalked where they believed Thomas to be staying at 9923 South Yale Street. In fact, this was the home of Thomas's parents, George and Janet Lambert. On August 27, 1977, at 6:00 a.m., El Rukns Henry Andrews and Teddy Parrish were confronted by police as they sat in a car one-half block from the Lamberts' home. In the car were a pair of binoculars and a ski mask.

On the morning of September 1, 1977, Thomas was scheduled to meet with defense attorneys William Swano and Michael Green at the Cook County State's Attorney's Office. Cook County Circuit Court Judge Louis Garippo, who was presiding over the Bell and Miller case, had ordered the State to produce Thomas because the defense could not locate and attempt to interview her. Before dawn that morning,

Rowena James picked up her parents at their home. Also in the car were James' daughter and son, who were 4 and 5 years old. As part of her daily routine, James intended to drop her children off at daycare, take her parents to work, and then go to work herself.

Watching James as she picked up her parents were William Doyle, Henry Andrews, George Carter, and Teddy Parrish. They followed James's car to the traffic light at the corner of 98th Street and S. Wentworth. When James's car stopped, the El Rukns pulled up next to the driver's side. Doyle stuck a pump shotgun out the window of the El Rukn car and fired two shots into James's head, killing her instantly. The photograph below of Rowena James after she was removed to the coroner's office was introduced into evidence against Doyle at his trial:



Bell and Miller went to trial several weeks later and Audriana Thomas testified against them. Doyle, Hawkins, Kees, Carter, Andrews, and Derrick Porter attended the trial in Moorish garb typically worn by the El Rukns. While testifying, Thomas became so upset that she threw up on the stand. The jury convicted Bell and Miller and Judge Garippo sentenced them each to 100-to-200 years in the IDOC.

The jury in this case returned special verdicts convicting Doyle of the conspiracy to murder Audriana Thomas and the shotgun murder of her sister Rowena James.

- **Racketeering Act No. 9: The Conspiracy to Murder Members of the Titanic Stones**

On June 14, 1981, Doyle and other El Rukn hit team members Earl Hawkins, Ray Ferguson, Derrick Kees, Anthony Sumner, and Derrick Porter drove to East 43rd Street and South Indiana Avenue intending to shoot and kill as many Titanic Stones gang members as possible. While Doyle stood next to him, Derrick Kees fired several shots from a Super .38 semiautomatic pistol, killing Willie Bibbs as he stood in front of the Fountainhead Lounge with about six other Titanic Stones.

The events that led up to the Bibbs murder began in early 1976, when Fort ousted Eugene Hairston from the leadership of the El Rukns. Hairston remained as leader of his own gang, a large faction of the Black P Stone Nation known as the Titanic Stones that operated primarily in the area of E. 43rd St. and S. Indiana Avenue. A major source of income for the Titanic Stones was the sale of Ts and Blues, placing them in direct competition with the El Rukns. Beginning in 1980, Fort began to send top Generals and Officers to meet with the Titanic Stones leadership and tell

17

them to stop using the name "Stones" and to begin selling narcotics for the El Rukns. Despite several such visits, the Titanic Stones refused to drop their name and continued to sell narcotics independent of the El Rukns. As a result, Jeff Fort issued orders to kill all the top leaders of the Titanic Stones, including "Bull" Hairston, Barnett Hall, and George "Duke" Thomas.

On June 14, 1981, Fort held a meeting in his apartment on the third floor of the Alhambra apartment building at 6417 South Kenwood. Among the El Rukns in attendance were hit team members Doyle, Earl Hawkins, Derrick Kees, Anthony Sumner, Hank Andrews, George Carter, Sammy Knox, and Ray Ferguson. During this meeting Fort stated that he was going to make a move on the Titanic Stones on 43rd Street because they had disregarded his messages. Fort directed Doyle to "reach for the swords", referring to the cache of weapons Doyle kept in his apartment at the Alahambra. Doyle brought down a duffle bag containing handguns and a Thompson submachine gun. Fort assigned Ferguson, Doyle, and Kees to be shooters. Ferguson took the Thompson, Doyle took two handguns, and Kees took a Super .38 semiautomatic pistol. Fort assigned Hawkins as a lookout and spotter and gave Hawkins his personal .9 mm handgun. Sumner and Porter were assigned as the drivers.

When the hit team arrived in the area of 43rd and Indiana, Hawkins took up a position on 43rd Street across from the Fountainhead Lounge. His job was to make sure the coast was clear and to signal to Kees, Doyle, and Ferguson in the alley when there were Titanic Stones on the street. When Hawkins saw the three shooters

coming down the alley, he motioned with his hat. As Ferguson was attempting to pull the Thompson machinegun out of a duffle bag, Kees jumped out of the alley and fired several shots toward the group in front of the Fountainhead, fatally wounding Willie Bibbs. The three shooters then fled back down the alley to Sumner and Porter in the waiting cars, while Hawkins took an El train to 63rd Street and walked the few blocks back to the Alhambra on 64th Street. The hit team reported to Jeff Fort, describing the killing of Bibbs.

Gregory Hollie identified Hawkins as the lookout in a lineup shortly after the shooting and Hawkins eventually was arrested and prosecuted for his role in the shooting. The El Rukns threatened Hollie prior to trial, however, so he refused to testify and the jury acquitted Hawkins. Doyle, Derrick Kees. Ray Ferguson, Derrick Porter, and Jeff Fort were convicted of the Bibbs murder in 1988 following a jury trial in Cook County which Hawkins and Anthony Sumner testified.[4] In November 1988 Doyle was sentenced to 55 years' imprisonment in the IDOC.

The jury in this case returned a special verdict finding Doyle guilty of the conspiracy to murder members of the Titanic Stones.

- **Racketeering Act No. 13: The Attempted Murder of George Thomas, The Murder of Charmaine Nathan, and the Attempted Murder of Sheila Jackson**

In December 1981 Fort ordered the murder of Titanic Stones leader Barnett Hall and Derrick Kees and Anthony Sumner shot and killed him on 64th Street down

---

[4] Because Hawkins had been acquitted and could not be prosecuted again for the Bibbs killing, he later cooperated and testified against Doyle, Fort, Kees, Ferguson, and Porter in 1988 when they were tried and convicted of the Bibbs murder in Cook County Circuit Court.

the block from the Alhambra on December 23, 1981. In January 1982 Fort ordered the murder of Titanic Stones drug dealer Bruce Davis and he was shot four times by Jackie Clay and Alvin Toney but lived. After Hawkins' release on the Bibbs shooting later in 1982, Jeff Fort met with him, Doyle, Derrick Kees, and others to express his displeasure with the fact that Duke Thomas had not yet been killed.[5] The El Rukn hit team members, including Doyle, increased their efforts to locate Thomas.

On January 23, 1983, several members of the hit team saw a man they thought was Duke Thomas outside the Home of The Champs Pool Hall on E. 43rd Street and S. Indiana Avenue. They reported back to Jeff Fort in the Alhambra and he ordered them to gather weapons and kill Thomas. William Doyle, Alvin Toney, Jackie Clay, and Derrick Kees left the Alahambra building in a car driven by Toney while Ray Ferguson and Edgar Cooksey followed in a VW with the guns in the trunk. As they left, J.L. Houston drove up in his Buick Electra 225. Earl Hawkins, who had recently been released from Cook County Jail after fighting the Bibbs case, told Houston that the others had just left to kill Thomas, and Houston quickly drove off to catch up with them.

The three hit team cars drove to E. 43rd Street and took up positions in the Kentucky Fried Chicken parking lot across the street from the pool hall. A short time later, the man they believed was Duke Thomas came out of the pool hall and got into a white Cadillac containing three girls, 20-year-old Ann Quinn, 21-year-old Charmaine "Lynn" Nathan, and 17-year-old Sheila Jackson. The man was actually

---

[5] Fort's policy was to kill the leaders of rival gangs one at a time as each rose to power to send the message not to cross him.

William "Bear" Jones who had borrowed Thomas's Cadillac and had no dispute with the El Rukns.

As Bear Jones drove south on Michigan Avenue, the hit team cars followed. They were a few blocks behind the Cadillac when it parked on the west side of the street in front of a large courtyard building at 5640 S. Michigan Ave, so they did not see Bear get out and go into the building and leave the three girls alone in the car. Ann Quinn was in the front passenger seat, Lynn Nathan was in the rear driver's side seat, and Sheila Jackson was in the rear passenger seat. The girls talked and listened to the radio while they waited for Bear to return. Ann Quinn was turned halfway around facing the two girls in the backseat, while Lynn Nathan and Sheila Jackson were facing each other.

After seeing the parked Cadillac, the hit team cars pulled into an alley nearby and the members got their guns from the trunk of Ferguson's car. Alvin Toney was driving a green Marquis with Doyle and Derrick Kees in the front and back passenger seats respectively. Houston's Buick Electra 225 followed Toney's car as they drove to kill the person they thought was Duke Thomas. After the Cadillac had been sitting in front of 5640 S. Michigan Avenue for about 20 minutes, Toney pulled up alongside it and Doyle and Kees, wearing ski masks, leaned out the passenger side windows and opened fire, emptying their guns into the Cadillac. As Toney sped away, J.L. Houston drove up, got out of his car, and fired his weapon into the Cadillac, riddling it with bullets.

21

As a result of this onslaught, Lynn Nathan was shot five times, including through the left side of her face and through both hands, and died in the car. Sheila Jackson suffered three through-and-through gunshot wounds in her right arm, left leg, and stomach. She spent weeks in the hospital enduring multiple surgeries, and thirty-nine years later still suffers permanent and debilitating injuries. Miraculously, Ann Quinn escaped injury by rolling out the front door and into the gutter under the car.

The hit teams raced back to the Alahambra to report to Jeff Fort on what they thought was a successful mission. Doyle and Kees reported that they were in the first car and shot out the windows and into the Cadillac. Houston reported being in the second car and "unloading" on the Cadillac because he saw a hand move within it and didn't want to leave any survivors. Lynn Nathan had bullet wounds in both her hands from trying to protect herself from Houston's fusillade.

When the El Rukns later learned that Duke Thomas was not in the car and that an innocent girl had been mistakenly killed and another badly wounded, Jeff Fort told them that "In war there are casualties."

The jury in this case returned special verdicts finding Doyle guilty of the murder of Charmaine Nathan and the attempted murders of Sheila Jackson and Duke Thomas.

- **Racketeering Act No. 15**: **The Conspiracy to Murder Melvin and Jerry Ewing**

- **Racketeering Act No. 16: The Attempted Murders of Jerry Little and Phillip Steele**

One month after killing Charmaine Nathan and badly wounding Sheila Jackson, Doyle participated in attempting to find and kill Melvin and Jerry Ewing and the shooting of Jerry Little and Phillip Steele.

The dispute between the Ewings and the El Rukns arose from the 1981 murder of former El Rukn General Carl "Popcorn" Taylor. The Ewing brothers were arrested and charged with Taylor's murder. El Rukns, including Doyle, went to court to identify Taylor's killers. The Ewings were eventually acquitted and released. Doyle, Hawkins, Clay, Kees, and other El Rukns killers thereafter began stalking a house located at 7810 South Muskegon Avenue in which they believed the Ewings lived and identified a blue Chevrolet as the car they thought the Ewings drove. In fact, 7810 South Muskegon was the home of Jerry Little and his family and the blue Chevrolet belonged to him. The Ewings actually lived five doors down at 7838 South Muskegon.

On February 23, 1983, Jeff Fort gathered Doyle, Hawkins, Clay, Kees, Harry Evans, and other El Rukns in the "security apartment" of the El Rukns "Peace and Love Building" building at 75th and Kingston. At Fort's order, Doyle retrieved a number of guns from his apartment. After Doyle, Evans, and Clay took weapons they drove with Hawkins and Kees to kill the Ewings. The hit team located the car they believed to be the Ewings' and followed it to 75th Street and S. Essex Avenue. They watched as Jerry Little and his friend Phillip Steele exited the car and walked to the

23

lounge around the corner. Kees was posted as a lookout to alert the other team members when their intended victims left the lounge.

When Little and Steele returned to the car, Kees gave the signal to Hawkins, who drove his car up and blocked the blue Chevrolet with Little and Steele inside. Doyle, Evans, and Clay stepped out of Hawkins's car and fired into the Chevrolet as Hawkins drove north on Essex. Doyle fired a shotgun twice into the rear window of Little's car and Clay fired a handgun and a carbine into the car. When they finished, Kees picked them up and drove off. Little was shot six times but Steele miraculously escaped without any wounds. Both survived the assault.

After the shooting, the hit team returned and reported to Jeff Fort at 75th and Kingston. Fort told Doyle to make sure who had been shot. When Doyle's calls to hospitals and morgues revealed no Ewings, Fort sent Doyle back to the neighborhood to check further. Doyle went to Little's home at 7810 South Muskegon. When Jerry Little's younger sister, Ouida, answered the door, Doyle asked if her brother was home. Ouida Little answered that he was not. She learned later that night that her brother had been shot. Ouida Little identified Doyle in court as the man who visited her that night.

The jury in this case returned special verdicts convicting Doyle of the conspiracy to murder Melvin and Jerry Ewing and the attempted murders of Jerry Little and Phillip Steele.

24

### D. Doyle's Sentencing

#### 1. Counts One and Two: The Racketeering Counts

Count One charged Doyle with RICO conspiracy in violation of 18 U.S.C. § 1962(d). Count Two charged Doyle with substantive racketeering in violation of 18 U.S.C. § 1962(c). The conspiracy and the enterprise charged in Counts One and Two commenced in 1966 and continued until the indictment was returned in 1989. Racketeering Act 31 of Count Two for which Doyle was convicted include a narcotics conspiracy that also lasted until the indictment was returned in 1989; the same conspiracy was charged as a substantive offense in Count Three.

When the RICO statutes were originally enacted the violations charged in Counts One and Two carried maximum penalties of 20 years' imprisonment and a fine of $250,000. Effective November 18, 1988 the maximum penalty for § 1962 was increased to life imprisonment if "the violation is based upon a racketeering activity for which the maximum penalty includes life imprisonment" such as murder. 18 U.S.C. § 1963 (amended by Pub. L 100 - 690, § 7058(d) effective Nov. 18, 1988).

#### 2. Count Three: The Narcotics Conspiracy

Count Three (and Racketeering Act 31 of Count Two) charged that Doyle participated in a narcotics conspiracy in violation of 21 U.S.C. § 846 that commenced in 1966 and continued until the return of the indictment in October 1989. Prior to October 27, 1986 the maximum penalty applicable to this statute was 20 or 30 years, depending on the amount of narcotics involved in the conspiracy. 21 U.S.C. § 841(b) (1985). Congress amended the maximum penalty of this statute effective October 27,

1986 to life in cases where the amount of narcotics was that involved in Doyle's prosecution. Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1002, 100 Stat. 3207-2, 3207-5 (1986); *United States v. Canino*, 949 F.2d 928, 951 (7th Cir. 1991).

### 3. The District Court's Decision on Statutory Penalties and Application of the Sentencing Guidelines

After Doyle's first conviction the Probation Office prepared a Presentence Investigation Report (PSR) and submitted it to the Court on October 16, 1991. The government thereafter submitted its official version of the offense. Probation filed a "Corrected Copy" of the PSR, which the Court struck from the record on October 30, 1991. In a May 5, 1992 Order the Court denied the government's motion to reconsider that decision. *See* Exhibit 1 at 110-143 (May 5, 1992 Order). The Court also held that the El Rukn enterprise and the conspiracies charged in the indictment continued well after the November l, 1987 effective date of the Sentencing Guidelines, that Doyle personally participated in the organization until at least July 1988, that the Sentencing Guidelines therefore applied to Doyle's convictions, and that the amended increased narcotics penalties applied. Exhibit 1 at 128 -130; 142-43.

Following Doyle's retrial and reconviction the Probation Office submitted an updated PSR on June 6, 1995. Exhibit 1. The new PSR calculated Doyle's Sentencing Guidelines adjusted base offense level for Counts One and Two as level 46 and his criminal history category as Category IV. *Id*. at 18-45. This was based on the PSR's calculation of base offense level 43 for the murders of Rowena James and Charmaine Nathan plus 3 levels for the application of the multiple count grouping rules. *Id*. These calculations were specifically adopted by Judge Conlon in the September 20,

1995 Judgment and Commitment Order's "Statement of Reasons" for Doyle's sentence. *See* Exhibit 2 at 4 (Doyle's J&C Order).

Although the crimes alleged in Counts One and Two extended past November 18, 1988 and thus subjected Doyle to life sentences for the racketeering offenses because he was convicted of murder offenses, prior to sentencing the government advised Judge Conlon that it did not intend at sentencing to establish Doyle's participation in the racketeering enterprise after that date because the Court had already decided to apply a maximum penalty of life on Count Three, thus rendering moot the maximum penalties for Counts One and Two. *See* Exhibit 1 at 92 and n. 2. The government therefore advocated at sentencing that Doyle be sentenced to the pre-November 18, 1988 penalties of 20 years' incarceration on each of Counts One and Two, and sought the imposition of the amended 1986 penalty of life imprisonment on Count Three.[6]

On September 20, 1995 Judge Conlon sentenced Doyle to life imprisonment under the Sentencing Guidelines on Count Three and 20 years' imprisonment on Counts One and Two, "said sentence to run concurrently." Exhibit 2 at 2. However, Judge Conlon did not order this federal sentence to run concurrently to Doyle's 55 year Illinois sentence for the Bibbs murder he had begun in November 1988. Doyle's federal sentence therefore automatically runs consecutive to that State sentence pursuant to 18 U.S.C. § 3584. Doyle appealed his conviction, but not his sentence,

---

[6] This position may also have been influenced by the fact that Doyle was immediately taken into State custody on November 14, 1988 following his conviction for the Bibbs murder, four days before the new RICO maximum life penalties took effect.

and it was affirmed by the Seventh Circuit in 1997. *United States v. Doyle*, 121 F.3d 1078 (7th Cir. 1997).

After his federal sentencing, Doyle was sent back to the custody of the IDOC in October 1995 to serve his Illinois sentence for the Bibbs murder. He remained there until completing that sentence in early 2016 when he was paroled to the Bureau of Prisons (BOP) on April 18, 2016 and began his federal life sentence. *See* Exhibit 3 (Doyle's IDOC Prisoner Movement History) and Exhibit 4 at 3 (Doyle's BOP Public Information Inmate Data). Doyle has now completed approximately 6 1/3 years of that sentence and is currently incarcerated at the United States Prison (USP) Coleman I, a High Security prison facility in Florida.

### III.     The Bureau of Prisons' Response to COVID-19

As the Court is aware, from the moment the COVID-19 pandemic began the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years and refined in early 2020 in consultation with the Centers for Disease Control (CDC) and the World Health Organization. Those efforts continue.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all

institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry. When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.[7]

The BOP's strenuous efforts, now bolstered by widespread vaccination, have been fruitful. It is notable that the rate of deaths in federal prisons has been comparable to that in the general U.S. population, a substantial achievement given the known risks of viral spread in a prison setting.[8]

The BOP has worked to ensure that it received COVID-19 vaccines as they became available and offered vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then to inmates in order of priority of need, in accordance with CDC guidelines. As one court observed, "Since the vaccines became

---

[7] In addition, acting under the authority granted in the CARES Act, the BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population is now more than 10% less than it was at the outset of the pandemic and is at the lowest level in decades.

[8] While there have been approximately 291 inmate deaths related to COVID-19 at BOP institutions (which at the outset of the pandemic held over 157,000 inmates), and 11 inmates have died while on home confinement, there have been approximately 1,024,611 deaths in the general population. *See* https://www.bop.gov/coronavirus/;https://covid.cdc.gov/covid-data-tracker/#datatracker-home (both last viewed 08/01/22). There is no indication that the BOP toll is materially worse than in the rest of the country.

available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

As of August 1, 2022 the BOP has offered a vaccine to every inmate in BOP-managed institutions and has administered a total of 325,400 doses to inmates and staff members.[9] Going forward, the BOP will continue to offer inmates vaccines, as well as vaccine boosters, as expeditiously as possible as supplies are available. The latest information on the BOP's vaccination efforts is available at https://www.bop.gov/coronavirus/ and is updated every weekday.

The BOP Coleman complex where Doyle is incarcerated is comprised of four separate facilities based on prisoners' security levels—USP Coleman I houses 1333 high security inmates, USP Coleman II houses 1152 high security inmates, FCI Coleman Medium houses 1612 medium security inmates, and FCI Coleman Low houses 1961 low security inmates. Notably, as of August 1, 2022, of these 6058 inmates there are only two housed at the FCI Coleman Medium facility who are positive for COVID-19; none of the inmates at Doyle's institution, USP Coleman I, are currently infected.[10]

---

[9] *See* https://www.bop.gov/coronavirus/ (last visited 08/01/22).

[10] https://www.bop.gov/coronavirus/;jsessionid=D6DE0AAE2F5A229770ADCDFFB2791B96 (last visited 08/01/22).

## IV.    Argument

### A. Applicable Law

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391,

18 U.S.C. § 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Pursuant to Congress's directive, prior to the enactment of the First Step Act,

the U.S. Sentencing Commission promulgated Guideline § 1B1.13, which sets forth

the Sentencing Commission's policy statement with respect to 18 U.S.C.

§ 3582(c)(1)(A). Consistent with the statute, Guideline § 1B1.13 provides that a court

may reduce a term of imprisonment, after considering the § 3553(a) factors, if three

criteria are satisfied: (1) "extraordinary and compelling reasons warrant the

reduction"; (2) "[t]he defendant is not a danger to the safety of any other person or to

31

the community, as provided in 18 U.S.C. § 3142(g)"; and (3) the reduction is consistent with the factors set forth in 18 U.S.C. § 3553, to the extent relevant. *See* Guideline § 1B1.13.

As Congress expressly directed, the Sentencing Commission's policy statement defined the "extraordinary and compelling reasons" that might warrant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

Application Note 1 to Guideline § 1B1.13 limited the "extraordinary and compelling reasons" for which a sentence reduction is appropriate to the following particular circumstances:

1.  The defendant suffered from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 cmt. n.1(A).

2.  The defendant was at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).

3.  The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* § 1B1.13 cmt. n.1(C).

4. "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D).

U.S.S.G. § 1B1.13, cmt. n. 1.

In *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020), the Seventh Circuit held that because Guidelines § 1B1.13 has not been amended following the enactment of the First Step Act, "the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release." *Id.* at 1180. Therefore, the court held, district courts are free to consider prisoners' motions for a sentence reduction on grounds other than the categories of extraordinary and compelling reasons listed in Guideline § 1B1.13, as limited by the statute itself. *Id.* However, the court pointed out that:

> [t]he substantive aspects of the Sentencing Commission's analysis in §1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.

*Id.* Therefore, pursuant to *Gunn*, Guideline § 1B1.13 remains instructive, though not exhaustive, in determining the meaning of the term "extraordinary and compelling reasons" for purposes of § 3582(c)(1)(A)(i).

Subsequently, the Seventh Circuit provided further guidance regarding discretionary sentencing reductions under § 3582(c)(1)(A), suggesting a two-step analysis:

> At step one, the prisoner must identify an "extraordinary and compelling" reason warranting a sentence reduction.... Upon a finding that the prisoner has supplied such a reason, the second step of the

33

> analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in § 3553(a) as part of determining what sentencing reduction to award the prisoner.

*United States v. v. Thacker*, 4 F.4th 569, 576 (7th Cir. 2021).

### B. Defendant Has Exhausted his Administrative Remedies

Section 3582(c)(1)(A) provides that "the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ." Doyle submitted a Reduction In Sentence Application (RIS) to the Warden at Coleman on March 10, 2022, apparently on the basis that he had a recent biopsy for prostate cancer (which was negative). *See* Exhibit 5. His request was denied by the Warden on May 13, 2022 and Doyle received notice of the denial on May 18. *Id.* As more than 30 days have elapsed since Doyle filed his RIS, the government agrees that he has exhausted his administrative remedies.

### C. Defendant Has Not Established "Extraordinary and Compelling Reasons" That Warrant Consideration of a Sentence Reduction

As stated above, a defendant seeking compassionate release must establish, among other things, "extraordinary and compelling reasons" warranting a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). Doyle has not identified any medical condition(s) that he claims "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" pursuant to USSG § 1B1.13 cmt. n.1(A), and his

34

BOP medical records, which are filed under seal, do not support such a claim.[11] Those records show that Doyle has had hypertension since 1983 for which he has taken routine medication since at least his most recent entry into the BOP system in April 2016. *See* Exhibit 6A (2016) at 1-4; 13-32; 50-54; 80; Exhibit 6B (2017) at 1-3; 8-9; 27-29; 32-37; 40-46; Exhibit 6F (2021) at 5-8; 12-14; Exhibit 6G (2022) at 17-25. The records also reflect that Doyle for years has had mild degenerative osteoarthritis in his neck, back, and left hip for which he sometimes takes pain medication and sometimes uses a wheelchair to move around the prison. Exhibit 6A (2016) at 64; Exhibit 6F (2021) at 5-8; 12-14; and Exhibit 6G (2022) at 4; 33-35. The only other area of concern noted in his records is that in 2017 he began to have "mildly elevated" PSA levels on his regular prostate exams for which he was then regularly monitored and tested, including having six areas of his prostate biopsied in September 2021, all six of which samples were negative for cancer. Exhibit 6B (2017) at 15-19; 22; Exhibit 6F (2021) at 1-2; 97-108; 113-115; 120-124; Exhibit 6G (2022) at 6; 11-13; 17-25. In short, Doyle's medical records reflect that he is healthy and do not reflect that he has been denied any medically-necessary care or medication.

The government recognizes that CDC guidance reflects that people with hypertension are "possibly … more likely to get very sick from COVID-19."[12]

---

[11] Doyle's BOP medical records for the years he has been in federal custody - 2016 through 2022 - are filed under seal as Exhibit 6A, B, C, D, E, F, G, and H and are bates stamped in the lower right-hand corner of each page as "BOP Med" followed by the respective year and page number (e.g., Ex 6A is "BOP Med 2016-00001", Ex. 6B is "BOP Med 2017-00001" etc.).

[12] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited 08/01/22).

However, Doyle has had his hypertension under control with ordinary medication for approximately 39 years. Hypertension (commonly called high blood pressure) is not a condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" pursuant to USSG § 1B1.13 cmt. n.1(A). *United States v. Gold*, 459 F. Supp.3d 1117, 1120 (N.D.Ill. 2020) ("the medical issues that Mr. Gold claims render him especially vulnerable to COVID-19—pre-emphysema, high blood pressure, and high cholesterol—are common and do not appear to be among those the CDC has identified as significant risk factors"); *United States v. Hawkins*, No. 2:17-CR-134-JVB-JEM, 2020 WL 4671167, at *2 (N.D. Ind. Aug. 12, 2020) (denying defendant's motion for compassionate release after finding no extraordinary and compelling reason to do so, where CDC's most recent guidance has concluded only that hypertension "might present an increased risk of severe illness from COVID-19" and where medical records showed that defendant was being treated for that condition and denied any complications).

More importantly, any risk posed by hypertension is drastically reduced by the fact that Doyle has been twice vaccinated and received a booster shot against COVID-19: he received his first dose of the Moderna vaccine on May 18, 2021, his second shot on June 15, 2021, and a booster shot on January 21, 2022. Exhibit 6F (2021) at 59; Exhibit G (2022) at 16; 37. The CDC reports that the FDA-authorized COVID-19 vaccines "protect everyone ages 5 years and older against severe illness, including disease caused by the Delta variant and other variants circulating in the United

States."[13] With respect to the recent Omicron variants, the CDC states that, as in the case of Delta and other earlier variants, "current vaccines are expected to protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant."[14] With respect to fully vaccinated individuals, the CDC states that such individuals who contract "breakthrough" infections are "less likely to develop serious illness than those who are unvaccinated and get COVID-19."[15] Specifically, "[e]ven when fully vaccinated people develop symptoms, they tend to be less severe symptoms than in unvaccinated people. This means they are much less likely to be hospitalized or die than people who are not vaccinated."[16] Accordingly, at this time, the available vaccines permit effective self-care against severe illness or death that may be caused by COVID-19.

Indeed, the Seventh Circuit has held that prisoners who have access to a vaccine cannot obtain compassionate release based on the risk of COVID-19 unless they can establish that they cannot receive or benefit from the vaccine. *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) ("the availability of a vaccine makes it

---

[13]    *See*    https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last 08/01/22).

[14]    *See*  https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html    (last accessed 08/01/22).

[15]    *See*    https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last visited 06/03/22).

[16]    *See*    https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last visited 06/03/22).

impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release."); *United States v. Kurzynowski*, 17 F.4th 756, 758 (7th Cir. 2021) ("[T]he fact that Kurzynowski is vaccinated precludes a finding that the COVID-19 pandemic presents extraordinary and compelling reasons for his release."); *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021) (it would be an abuse of discretion for a judge to grant release based on COVID-19 risk to a prisoner with access to vaccines). Doyle has not alleged, much less established, that he cannot receive or benefit from the vaccine, or that he is at heightened risk despite being vaccinated.

Doyle's risk from COVID-19 is even further reduced by conditions at the Coleman BOP complex. As noted above, only two of the 6058 inmates in the four facilities are currently positive for COVID-19, and none of the inmates at Doyle's facility, USP Coleman I, are currently infected. These figures indicate that the efforts of the BOP to limit and control the spread of the virus to date—including the administration of COVID-19 vaccines—have been very successful.

### D. There Is No Unwarranted Sentencing Disparity Between Doyle and His Co-Defendants

Doyle compares his life sentence to the lower sentence given to former El Rukn General Trammell Davis and asserts that because others who also had the rank of General in the Organization served lesser sentences he should be released. However, Trammell Davis is distinguishable from Doyle in every important way—he was not Doyle's co-defendant, was not convicted of murder, was arrested and prosecuted before the Sentencing Guidelines took effect, and testified in multiple trials against

Jeff Fort and many other El Rukn Generals at great personal risk. Davis was arrested and charged with Jeff Fort, Alan Knox, and several others in August 1986 for conspiring to obtain a Light Antitank Weapon (LAW Rocket) to use in a terrorist scheme to obtain money from Moammar Kaddafi. Davis testified for the government against Fort and Knox in October 1987, two years before Doyle was even indicted in this case in October 1989. In addition, Davis was "the houseman" at the Fort whose job was to oversee the drug operations and report daily over the telephone to Jeff Fort in Bastrop prison; he was not a member of the hit team and did not kill on Jeff Fort's orders as Doyle did. The fact that Judge Norgle took all those factors into account in sentencing Davis in 1987 makes his situation and sentence wholly different from Doyle's.

In comparing himself to his actual co-defendants who have been released from prison or obtained lesser sentences, Doyle ignores the others who, like him, are serving life sentences. There are currently five other El Rukn defendants besides Doyle who were convicted in this case still serving life sentences: J.L. Houston, Sammy Knox, Noah Robinson, Eddie Franklin, and Bernard Green. And there are three others who received life sentences that have died in federal prison: Thomas Bates, Charles Green, and Jake Crowder.

• J.L. Houston was convicted of multiple murders and attempted murders. He was convicted of the murder of Lynn Nathan and the attempted murder of Sheila Jackson, which is discussed above, as well as conspiring to murder Duke Thomas and other members of the Titanic Stones. He was also convicted of murdering

39

Chalmers Tyler and Ronnie Bell on Jeff Fort's orders. Houston, like Doyle, was granted a new trial, retried, reconvicted, sentenced to natural life by Judge Zagel and is still incarcerated.

· Eddie Franklin was J.L. Houston's codefendant in both his trials and also planned and approved multiple murders, as set forth in the Government's Response to Franklin's COVID Motion, R. 6053. Franklin was also sentenced to life by Judge Zagel after his retrial and is still incarcerated.

· Sammy Knox, Alan Knox's brother, was convicted of the murders of Gilbert Conners and Gregory Freeman, as well as kidnapping Patricia McKinley, a witness to the beating murder he participated in of Maurice Coleman, and several murder conspiracies. Knox too was granted a new trial, retried, reconvicted, sentenced to natural life by Judge Zagel and is still incarcerated.

· Noah Robinson was convicted of contracting with the El Rukns for two interstate murders-for-hire, one of which Melvin Mayes participated in directly by driving a carload of El Rukn hitmen to Greenville, South Carolina, on January 2, 1986 where Edgar Cooksey executed Leroy "Hambone" Barber by shooting him in the back of the head in the lobby of The Robinson Building. Robinson too was granted a new trial, retried, reconvicted, sentenced to natural life by Judge Zagel and is still incarcerated.

· Melvin Mayes was a codefendant in the Robinson re-trial after having been a fugitive since 1986. He too was convicted of murder and sentenced to life by Judge Zagel. Mayes was released from prison several months ago after it was

determined that he is suffering from severe chronic obstructive pulmonary disease, is confined full-time to a wheelchair, and a doctor in the Bureau of Prisons concluded that patients in Mayes's condition "cannot be expected to live longer than a year and a half." *See United States v. Mayes*, 89 CR 908, Amended Opinion and Order at 4 (Dkt. No. 6792, Jan. 19, 2022).

· Bernard Green was convicted of planning, conspiring in, and calling the shots on multiple murders. His original sentence of life incarceration was never overturned and he is still incarcerated.

· Thomas Bates was convicted of planning and conspiring in multiple murders, received a life sentence, and original sentence was never overturned. Bates died in federal custody on November 30, 2020 after serving 31 years.

· Charles Green was convicted of planning and conspiring in multiple murders. Green too was granted a new trial, retried, reconvicted, sentenced to natural life by Judge Zagel and died on August 13, 2017 after serving 28 years.

· Jake Crowder, who spent over 30 years in a wheelchair as a result of a shooting, was convicted of planning and conspiring in multiple murders and received a life sentence. That sentence was never overturned and he died in federal custody in 1999.

Other defendants not convicted as shooters also served or are still serving lengthy sentences, including:

41

- Edward Williams, who was not convicted of murder or conspiracy to murder, had his Sentencing Guidelines natural life sentence reduced to 30 years under 18 U.S.C. § 3582(c)(2).

- Louis Hoover, also not convicted of murder or conspiracy to murder, had his sentence of 420 months reduced for the same reason to 292 months or 24.3 years.

- Roland Lewis, also not convicted of murder or conspiracy to murder, received a Sentencing Guidelines term of 480 months and has a projected out date of December 11, 2023, by which time he will have served about 33 years.

- Edgar Cooksey was convicted of the murder of Hambone Barber in the first El Rukn trial before Judge Aspen. When he was granted a new trial, Cooksey saw the writing on the wall and did the smart thing: he pled guilty to the Barber murder and testified against Noah Robinson, Sammy Knox, Melvin Mayes, Charles Green, and Jeff Boyd in the retrial before Judge Zagel. Robinson, Knox, Mayes, and Green all received life sentences because they were convicted of murder predicates, while Boyd received 50 years. After testifying Cooksey was resentenced to 170 months, which he did in a WitSec facility.

- Lawrence Crowder, Hank Andrews, George Carter, Michael Sardin, James Speights, Floyd Davis, Felix Mayes, and Melvin Tillman also were granted new trials and also did the smart thing: they all pled guilty and received lesser sentences than Doyle.

- Alan Knox was convicted in 1987 with Jeff Fort of seditious conspiracy and narcotics charges regarding trying to purchase a LAW rocket and use it to

42

impress Moammar Kaddafi. He received a pre-guidelines sentence of 54 years from Judge Norgle. When he was indicted in *Andrews*, Judge Aspen refused to put him into any of the five severed parts of that case, saying instead that he would be tried "last and alone – after all, how many lives does Mr. Knox have to give to the federal prison system?" Knox finally pled guilty to the charges against him, which included numerous predicate acts involving murder conspiracy as a result of his longtime service as a high-ranking General and advisor to Fort. He was not charged with any acts of murder. Because he was already in prison when the guidelines were adopted, Judge Aspen sentenced him to a pre-guidelines term of 51 years to run concurrent to the term he was already doing. He was released in 2019 after serving 33 years.

· Jeff Boyd was sentenced by Judge Zagel to a non-guideline sentence of 50 years after his second trial and was mandatorily released after 30 years.

· Andrew Craig was granted a new trail and also did the smart thing: he pled guilty to killing two El Rukns, McLilly and Love, in 1974 when he was about 19 years old. He agreed to a non-guideline sentence of 30 years and spent 23 years in federal prison.

To be sure, sentencing disparities should be avoided when they are "unwarranted." 18 U.S.C. § 3553(a)(6). That said, "[a] difference justified by the fact that some wrongdoers have accepted responsibility and assisted the prosecution, while others have not, is not 'unwarranted.'" *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see also United States v. Turner*, 604 F.3d 381, 389 (7th Cir. 2010).

43

As the Seventh Circuit recently reiterated in rejecting a similar disparity argument in *United States v. Wojtas*, 806 Fed. Appx. 490, 491 (7th Cir. 2020):

> Disparity yes, unwarranted no. Manglardi pleaded guilty and received a discount for accepting responsibility and assisting the prosecutors. Wojtas did not get these discounts and has only his own decisions to blame. We have held many times that defendants convicted after trial are not comparable, for sentencing purposes, to defendants who plead guilty and assist the prosecution. *See, e.g., United States v. Solomon*, 892 F.3d 273, 279 (7th Cir. 2018).

The cooperating witnesses in this case all received substantial sentences despite their cooperation and testimony.

· Former El Rukn Generals Henry Leon Harris, Eugene Hunter, Earl Hawkins, Derrick Kees, Jackie Clay, and Harry Evans all cooperated. They were incarcerated in extremely restrictive WitSec institutions the entire time they were in federal prison. All of them left the El Rukn Organization before the Guidelines were enacted so received non-guideline sentences. All of them testified in multiple El Rukn trials, putting their lives and those of their families in grave danger for years—in fact, until today.

o Harris was not charged with any murders, as he ran the El Rukns narcotics business. Harris testified in six trials during 1991-92, and his father's tavern in Milwaukee was shot to pieces as a result of his cooperation in order to intimidate him. Harris served approximately 16 years in federal prison.

o Hunter never entered a plea agreement with the government and testified in six trials in 1991-92. Hunter served approximately 12 years in federal prison.

44

o       Jackie Clay testified in nine El Rukn trials between 1991 and 1997. He left the El Rukns in 1985 when they started dealing heroin because his sister had died of a heroin overdose. Clay pled guilty to RICO, RICO Conspiracy, and narcotics conspiracy, and was originally sentenced to 80 years. Judge Aspen reduced his sentence in 1998 in light of his lengthy cooperation. Clay has continued to cooperate by testifying in civil trials brought by former El Rukn hitman Nathson Fields. Clay served approximately 10 years in federal prison.

o       Derrick Kees left the El Rukns in early 1986 after a falling out with Jeff Fort that resulted in Fort giving an order to kill him. Kees began to cooperate after being convicted of the Willie Bibbs murder with Fort, Doyle, Derrick Porter, and Ray Ferguson in 1988. Kees testified in nine trials, including the trial of Alexander "Ghost" Cooper, at the time the largest heroin dealer in Chicago, and as a key witness against Judge Thomas Maloney in 1993 in a trial in which Maloney was convicted of fixing multiple murders for the El Rukns and the Chicago Outfit. Kees continued to testify until 2017. He did over 33 years in federal prison in WitSec units the entire time before being released in late 2020. He has many times expressed remorse for the crimes he has committed, particularly the murder of Lynn Nathan and the shooting of Sheila Jackson he committed with Doyle—something William Doyle has never done.

o       Earl Hawkins testified thirteen times, including against Judge Maloney, who fixed his murder trial in 1986 and then sentenced him to death. Among other things, Earl Hawkins's truthful testimony resulted in the release of Elton

45

Houston and Robert Brown from prison for a murder J.L. Houston, Kees, and Hawkins committed. Hawkins served over 30 years in prison for his crimes.

The fact that Doyle did not plead guilty, has never accepted responsibility for his crimes, and has never provided substantial assistance, distinguishes him from all the cooperating El Rukns, particularly his hit team partners Earl Hawkins and Derrick Kees. There are no sentencing disparities in this case.

### E. A Sentence Reduction Would Be Inconsistent with the Pertinent Sentencing Factors Set Forth in 18 U.S.C. § 3553(a)

Finally, even if Doyle had made the requisite showing of extraordinary and compelling reasons for consideration of a sentence reduction, that is insufficient in itself to warrant relief under 18 U.S.C. § 3582(c)(1)(A)(i). Pursuant to the statute, the court must consider all pertinent § 3553(a) factors, including:

- the nature and circumstances of the offense;

- the history and characteristics of the defendant; and

- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Court should also consider the risk of recidivism Doyle poses, the quality of his release plan, the impact of BOP's efforts to maintain the safety of inmates, and the time remaining on his sentence—here, life. These considerations militate strongly against a sentence reduction or release in this case.

46

As set forth above, Doyle's offenses of conviction are serious and extremely violent. He was convicted of participating in a racketeering conspiracy in which he served for over 15 years as one of Jeff Fort's top leaders. He was instrumental in running the El Rukns' massive narcotics business that decimated the southside of Chicago for decades. He personally committed multiple murders, attempted murders, and conspiracies to murder, including the horrific murders of two innocent young women, Rowena James and Charmaine Nathan, and the shooting of Sheila Jackson. A victim impact statement opposing codefendant J.L. Houston's similar request for release from prison was submitted by Sheila Jackson, who miraculously survived the January 1983 shooting by Doyle and Houston and Derrick Kees that took the life of her friend, 21-year-old Lynn Nathan. Sheila Jackson was just 17 years old when she was shot three times and witnessed the horrific death of Lynn Nathan. Thirty-nine years later Ms. Jackson lives every day with the crippling impact and effects of Doyle's crime:

> On January 22, 1983 I was 17 years old, still really just a baby. I planned to go skating that afternoon with my friends near 95th Street and S. Eggleston Ave. Before I went, at about 4:00 p.m. I walked down to the Kentucky Fried Chicken to get my grandmother and myself something to eat. I saw two of my friends, Ann Quinn and Lynn Nathan, sitting in a white Cadillac parked in front of Champs Pool Hall on 43rd Street. A guy named Bear, who I hardly knew, was behind the wheel and Lynn, who was 21 years old, was in the back seat behind him. Ann, who was 20 years old, was in the front passenger's seat and asked me if I wanted to ride down the street with them. I said ok and got in the rear passenger seat. Bear drove us to 5640 S. Michigan Ave. and parked on the west side of the street facing south. He got out of the car and went into a large courtyard building next to where we parked.

> Lynn, Ann, and I stayed in the car talking and listening to the radio for about 20 to 30 minutes. Lynn and I were facing each other and

Ann was turned part way around so she could see and talk with us in the back seat. I then saw a green car pull up next to us. A man wearing a ski mask leaned out of the car and I heard shots. I looked at Lynn sitting right next to me and there was blood pouring out of her face like a water fountain from where she had been shot through her cheek. Ann went down on the floor while I tried to get out the back door. When I reached to open the door I was shot through my right forearm. I grabbed my arm and ducked down while Lynn sat there getting shot. I could hear the glass in the car windows shattering from the bullets. Ann managed to roll out the front door into the gutter. The shooting stopped and I could hear the squeal of the tires as the car sped away. Then came a bunch more gun shots real close together, and I was shot in my right leg and stomach. I saw Lynn trying to shield herself with her hand during the second shooting. When I finally got the door open and tried to get out of the car I couldn't walk because of my leg and stomach. Ann and I were both screaming over and over and holding each other.

I have never really recovered from the shooting. I still have PTSD when a car pulls up next to me or even slows down near me. I was unable to ride in cars for years afterwards and still get very anxious when I do. Because I had such major surgery after being shot in the stomach, I couldn't have children for many years. My arm and leg and stomach still hurt all the time, and I can't use my arm to lift or hold anything, including my grandchildren.

In the 1990s, I testified several times against the men who shot me and murdered Lynn. I was very glad to know that they were sentenced to life in prison. I have been told that one of them, J.L. Houston, is trying to get out of prison because of the COVID virus. I don't want that to happen. I am still very afraid of him, and my children are too.

*See* Exhibit 7. [17]

Doyle's lengthy criminal history prior to his convictions in this case, including

his prior state conviction for the Bibbs murder, resulted in him having a Criminal

History Category IV. He has shown a blatant disregard for the law his entire life and

---

[17] 18 U.S.C. § 3771(4) provides Ms. Jackson the right to be reasonably heard, *i.e.*, appear and testify, at any public proceeding in the district court involving release or sentencing of the accused, and she wishes to exercise that right.

has never shown the slightest hint of remorse in the years he has been incarcerated. Moreover, he has only served slightly over 6 years of his sentence and during that time has been a serious disciplinary problem in the BOP, including ordering the murder of an inmate who was then stabbed multiple times and nearly died. *See* Exhibit 8 (Under Seal).

In view of the extreme seriousness of Doyle's offenses and his long history of violent criminal conduct, early release would deprecate the seriousness of his offenses, and undermine the sentence's purposes of deterrence and protection of the public. Because Doyle has not established an extraordinary and compelling reason for release and has not established that his release would be consistent with the applicable policy statement and § 3553(a) factors, his motion should be denied. Having been given a sentence mandated by the Guidelines, Doyle should be required to complete that sentence in order to reflect of the seriousness of his offenses, to promote respect for the law, to provide just punishment for his offenses, to afford adequate deterrence to future criminal conduct, and to protect the public from further crimes by him—all of which are important § 3553(a) considerations militating against his release from custody at this time.

## V.    Conclusion

For the foregoing reasons, the government respectfully requests that defendant's motion be denied.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ William R. Hogan, Jr.*
WILLIAM R. HOGAN, JR.
Assistant United States Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document: **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE AND UNDER SEAL ATTACHMENT** were served pursuant to the district court's ECF system as to ECF filers, if any, and was sent by U.S. mail on August 2, 2022, to the following non-ECF filers:

William Doyle #08366-042
USP COLEMAN 1
U.S. PENITENTIARY
P.O. Box 1033
COLEMAN, FLORIDA 33521

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:      */s/ William R. Hogan, Jr.*
WILLIAM R. HOGAN, JR.
Assistant United States Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604

# Government Exhibit 2

AO 245 S (Rev. 4/90) Sheet 1 - Judgment in a Criminal Case

8310078L

# United States District Court

NORTHERN _____ District of _____ ILLINOIS

UNITED STATES OF AMERICA

V.

WILLIAM DOYLE

(Name of Defendant)

## JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed On or After November 1, 1987)

Case Number: 89 CR 908-12

MARIANNE JACKBLUE COPY-ATTEST
H. S. STUART CUNNINGHAM, CLERK

Defendant's Attorney

By _____ DEPUTY CLERK
U. S. DISTRICT COURT, NORTHERN
DISTRICT OF ILLINOIS
DATE: _____ OCT 5 1995

THE DEFENDANT:

☐ pleaded guilty to count(s) _____
☒ was found guilty on count(s) ONE, TWO and THREE _____ after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC 1962(d) | Racketeering conspiracy and racketeering | 10-26-89 | One |
| 18 USC 1962(c) | Racketeering | 10-26-89 | Two |
| 21 USC 846 | Conspiracy to distribute cocaine | 10-26-89 | Three |

RECEIVED
NOV 8 1995

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____ and is discharged as to such count(s).
☐ Count(s) _____ (is)(are) dismissed on the motion of the United States.
☒ It is ordered that the defendant shall pay a special assessment of $ 150.00 , for count(s) one, two and three _____, which shall be due ☒ immediately ☐ as follows:

IT IS FURTHER ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.: 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

Defendant's Date of Birth: 09/30/54

Defendant's Mailing Address:

71 W. Van Buren

Chicago, IL   60605

Defendant's Residence Address:

SEPTEMBER 20, 1995

Date of Imposition of Sentence

_____
Signature of Judicial Officer

SUZANNE B. CONLON, U.S. DISTRICT JUDGE

Name & Title of Judicial Officer

SEPTEMBER 20, 1995

Date

AO 245 S (Rev. 4/90) Sheet 2 - Imprisonment

Defendant: **WILLIAM DOYLE**
Case Number: **89 CR 908-12**

Judgment—Page **3** of **4**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of _____ **LIFE on count three and TWENTY (20) YEARS on counts one and two**_____ .

**Said sentence to run concurrently.**

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States marshal.
☐ The defendant shall surrender to the United States marshal for this district.
    ☐ at _____ a.m.
         p.m. on _____ .
    ☐ as notified by the United States marshal.
☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons,
    ☐ before 2 p.m. on _____ .
    ☐ as notified by the United States marshal.
    ☐ as notified by the probation office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____ at

_____ , with a certified copy of this judgment.

_____
United States Marshal

By _____
                Deputy Marshal

AO 245-3 (Rev. 4/90) Sheet 3 - Supervised Release

Defendant: **WILLIAM DOYLE**
Case Number: **89 CR 908-12**

Judgment—Page **3** of **4**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **TEN (10) YEARS on count three and FIVE (5) YEARS on counts one and two**

**Said sentence to run concurrently.**

While on supervised release, the defendant shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

☐ The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

☐ The defendant shall pay any fines that remain unpaid at the commencement of the term of supervised release.

☐ The defendant shall not possess a firearm or destructive device.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime. In addition:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer within 72 hours of any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245 S (Rev. 4/90) Sheet 7 - Statement of Re

Defendant: **WILLIAM DOYLE**
Case Number: **89 CR 908-12**

Judgment—Page **4** of **4**

## STATEMENT OF REASONS

☒ The court adopts the factual findings and guideline application in the presentence report.

OR

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

**Guideline Range Determined by the Court:**

Total Offense Level: **46**

Criminal History Category: **IV**

Imprisonment Range: **LIFE** to **LIFE** months

Supervised Release Range: **5** to **10** years

Fine Range: $ **25,000.00** to $ **8,000,000.00**

☒ Fine is waived or is below the guideline range, because of the defendant's inability to pay.

Restitution: $ _____

☐ Full restitution is not ordered for the following reason(s):

☒ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by application of the guidelines.

OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

OR

The sentence departs from the guideline range

☐ upon motion of the government, as a result of defendant's substantial assistance.

☐ for the following reason(s):

Government Exhibit 3

| Offender | Offender Status | Movement Date | Movement Type | Origin | Destination | Gate Violator | Parent Institution | Discharge Date |
|---|---|---|---|---|---|---|---|---|
| N84427 DOYLE, WILLIAM | DISCHARGE | 4/19/2019 9:30 DISCHARGE OUT | | INTERSTATE COMPACT | EXPIRATION OF SENTENCE | | MENARD | 4/19/2019 |
| N84427 DOYLE, WILLIAM | PAROLE | 4/18/2016 10:30 PAROLE OUT | | MENARD | DISTRICT 4 | | MENARD | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 8/2/2012 16:11 TRANSFER IN | | TRANSPORTATION | MENARD | | MENARD | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 8/2/2012 8:40 TRANSFER OUT | | PONTIAC | MENARD | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 5/17/2012 14:25 TRANSFER IN | | TRANSPORTATION | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 5/17/2012 8:11 TRANSFER OUT | | TAMMS | PONTIAC | | TAMMS | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 9/1/2006 15:38 TRANSFER IN | | TRANSPORTATION | TAMMS | | TAMMS | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 9/1/2006 8:10 TRANSFER OUT | | STATEVILLE | TAMMS | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 10/19/2005 17:00 WRIT RETURN | | TRANSPORTATION | STATEVILLE | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | TEMP RESIDENT | 10/19/2005 7:50 TEMPORARY OUT | | MENARD | STATEVILLE | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | TEMP RESIDENT | 10/11/2005 11:00 WRIT RETURN | | COURT | STATEVILLE | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | WRIT | 10/11/2005 5:45 WRIT OUT | | MENARD | COURT | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | TEMP RESIDENT | 10/5/2005 18:38 TEMPORARY IN | | TRANSPORTATION | MENARD | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 10/5/2005 9:15 WRIT OUT | | STATEVILLE | MENARD | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 10/4/2005 10:00 WRIT RETURN | | COURT | STATEVILLE | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | WRIT | 10/4/2005 9:10 WRIT OUT | | STATEVILLE | COURT | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 6/3/2005 13:37 TRANSFER IN | | TRANSPORTATION | STATEVILLE | | STATEVILLE | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 6/3/2005 8:30 TRANSFER OUT | | PINCKNEYVILLE | STATEVILLE | | PINCKNEYVILLE | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 5/12/2005 17:10 TRANSFER IN | | TRANSPORTATION | PINCKNEYVILLE | | PINCKNEYVILLE | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 5/12/2005 15:45 TRANSFER OUT | | MENARD | PINCKNEYVILLE | | MENARD | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 3/15/2000 19:13 TRANSFER IN | | TRANSPORTATION | MENARD | | MENARD | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 3/15/2000 9:35 TRANSFER OUT | | PONTIAC | MENARD | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 10/6/1999 16:10 TRANSFER IN | | TRANSPORTATION | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 10/6/1999 9:45 TRANSFER OUT | | WESTERN ILLINOIS | PONTIAC | | WESTERN ILLINOIS | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 5/8/1996 17:25 TRANSFER IN | | TRANSPORTATION | WESTERN ILLINOIS | | WESTERN ILLINOIS | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 5/8/1996 10:10 TRANSFER OUT | | PONTIAC | WESTERN ILLINOIS | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 10/11/1995 12:25 WRIT RETURN | | COURT | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | WRIT | 11/15/1994 5:10 WRIT OUT | | PONTIAC | COURT | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 9/29/1994 12:47 WRIT RETURN | | COURT | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | WRIT | 9/29/1994 7:38 WRIT OUT | | PONTIAC | COURT | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 3/9/1994 12:30 FURLOUGH RETURN | | FURLOUGH | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | FUNERAL FURLOUGH | 3/9/1994 8:40 FUNERAL FURLOUGH OUT | | PONTIAC | FURLOUGH | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 7/22/1993 11:15 WRIT RETURN | | TRANSPORTATION | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | TEMP RESIDENT | 7/22/1993 8:45 TEMPORARY OUT | | JOLIET | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | TEMP RESIDENT | 7/20/1993 12:25 WRIT RETURN | | COURT | JOLIET | | PONTIAC | |
| N84427 DOYLE, WILLIAM | WRIT | 12/4/1989 7:29 WRIT OUT | | PONTIAC | COURT | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 6/2/1989 14:19 FURLOUGH RETURN | | FURLOUGH | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | MEDICAL FURLOUGH | 6/2/1989 14:18 MEDICAL FURLOUGH OUT | | PONTIAC | FURLOUGH | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 11/23/1988 14:11 TRANSFER IN | | TRANSPORTATION | PONTIAC | | PONTIAC | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 11/23/1988 9:06 TRANSFER OUT | | JOLIET | PONTIAC | | JOLIET | |
| N84427 DOYLE, WILLIAM | IN CUSTODY | 11/17/1988 15:57 LOCATION CHANGE | | JOLIET RECEPTION CENTER | JOLIET | | JOLIET | |
| N84427 DOYLE, WILLIAM | RECEPTION | 11/15/1988 11:44 ADMIT IN | | ADMISSION | JOLIET RECEPTION CENTER | | JOLIET | |

Government Exhibit 4

```
CCCAK              *        PUBLIC INFORMATION           *       05-06-2022
PAGE 001           *           INMATE DATA               *       15:09:55
                            AS OF 05-06-2022


REGNO..: 08366-042 NAME: DOYLE, WILLIAM

                        RESP OF: COP
                        PHONE..: 352-689-6000    FAX: 352-689-6012
                                                 RACE/SEX...: BLACK / MALE
                                                 AGE:  67
PROJ REL MT: LIFE                                PAR ELIG DT: N/A
PROJ REL DT: LIFE                                PAR HEAR DT:
```

```
G0002       MORE PAGES TO FOLLOW . . .
```

```
CCCAK          *          PUBLIC INFORMATION          *          05-06-2022
PAGE 002       *          INMATE DATA                 *          15:09:55
                         AS OF 05-06-2022


REGNO..: 08366-042 NAME: DOYLE, WILLIAM

                    RESP OF: COP
                    PHONE..: 352-689-6000    FAX: 352-689-6012
FSA ELIGIBILITY STATUS IS: ELIGIBLE


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.


THE INMATE IS PROJECTED FOR RELEASE: LIFE


---------------------CURRENT JUDGMENT/WARRANT NO: 020 ------------------------

COURT OF JURISDICTION..........: ILLINOIS, NORTHERN DISTRICT
DOCKET NUMBER..................: 89 CR 908-12
JUDGE..........................: CONLON
DATE SENTENCED/PROBATION IMPOSED: 09-20-1995
DATE COMMITTED.................: 07-20-2016
HOW COMMITTED..................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED..............: NO

                  FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $150.00         $00.00          $00.00       $00.00


RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

------------------------CURRENT OBLIGATION NO: 010 -------------------------
OFFENSE CODE....:  545    18:1962 RACKETEER (RICO)
OFF/CHG: 18:1962(D) RACKETEERING CONSPIRACY AND RACKETEERING,CT 1;
         18:1962(C) RACKETEERING,CT 2;21:846 CONSPIRACY TO DISTRIBUTE
         COCAINE,CT 3

 SENTENCE PROCEDURE.............: 3559 SRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.: LIFE
 TERM OF SUPERVISION............:   10 YEARS
 DATE OF OFFENSE................: 10-26-1989










G0002      MORE PAGES TO FOLLOW . . .
```

```
CCCAK          *        PUBLIC INFORMATION        *        05-06-2022
PAGE 003 OF 003 *            INMATE DATA          *        15:09:55
                        AS OF 05-06-2022


REGNO..: 08366-042 NAME: DOYLE, WILLIAM

                    RESP OF: COP
                    PHONE..: 352-689-6000   FAX: 352-689-6012
------------------------CURRENT COMPUTATION NO: 020 ------------------------


COMPUTATION 020 WAS LAST UPDATED ON 07-29-2016 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 08-01-2016 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 020: 020 010

DATE COMPUTATION BEGAN..........: 04-18-2016
TOTAL TERM IN EFFECT............: LIFE
TOTAL TERM IN EFFECT CONVERTED..: LIFE
EARLIEST DATE OF OFFENSE........: 10-26-1989


TOTAL PRIOR CREDIT TIME.........: 0
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 0
TOTAL GCT EARNED................: 0
STATUTORY RELEASE DATE PROJECTED: N/A
ELDERLY OFFENDER TWO THIRDS DATE: N/A
EXPIRATION FULL TERM DATE.......: LIFE

PROJECTED SATISFACTION DATE.....: N/A
PROJECTED SATISFACTION METHOD...: LIFE




G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

Government Exhibit 5



UNITED STATES GOVERNMENT

# Memorandum

FEDERAL BUREAU OF PRISONS
Federal Correctional Complex
Coleman, Florida 33521

May 13, 2022

## RESPONSE TO INMATE REQUEST TO STAFF

SUBJECT:    Reduction in Sentence

RE:    Doyle, William
Reg. No.: 08366-042

This is in response to your Inmate Request to Staff Member, in which you request consideration for a Compassionate Release/Reduction in Sentence under Section 4., Requests Based on Non-Medical Circumstances, Subsection b., Elderly Inmates with Medical Conditions.

A thorough review of your request was completed utilizing Program Statement 5050.50, Compassionate Release/Reduction in Sentence, Procedures for Implementation of 18 U.S.C. §§ 3582(c) (1) (A) and 4205(g), requests for a Compassionate Release/Reduction. The criteria for a Reduction in Sentence (RIS) request under Elderly Inmates with a Medical Condition may include the following:

a.  **"New Law" Elderly Inmates.** Inmates sentenced for an offense that occurred on or after November 1, 1987 (e.g., "new law"), who are age 70 years or older and have served 30 years or more of their term of imprisonment.

b.  **Elderly Inmates with Medical Conditions.** Inmates who fit the following criteria:
  ▪ Age 65 and older.
  ▪ Suffer from chronic or serious medical conditions related to the aging process.
  ▪ Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility.
  ▪ Conventional treatment promises no substantial improvement to their mental or physical condition.
  ▪ Have served at least 50% of their sentence.

Based upon all the information gathered, your request does not meet all the criteria listed in the Program Statement 5050.50, as noted above. Therefore, your request for consideration for a Compassionate Release/Reduction in Sentence is denied. In compliance with Bureau of Prisons' Program Statement 5050.50, titled Compassionate Release/Reduction in Sentence, you may appeal this denial through the Administrative Remedy Program if you are unsatisfied with this response.

You will have 20 days to file an Administrative Remedy from the date you receive this notification from the Warden.

B. M. Antonelli, Complex Warden

Inmate Signature/Received Copy

5-18-22
Date

5-19-22
Date

Before completing this application, please review Program Statement 5050.50, Compassionate Release/Reduction in Sentence (RIS), available in the law library.

**REDUCTION IN SENTENCE APPLICATION**

March 10, 2022

NAME: Wm. A. Doyle III Unit: C REG No. 08366042 Date: Feb. 1, 2022

WHO IS YOUR PHYSICIAN (circle): Franco (Li) Bonnet-Engebretson Venuto

W. D.

Choose **One** Criteria: You can only apply under one criteria.

**Extraordinary/Compelling Circumstances:**
☐ Medical Circumstances:
　☐ Terminal Medical Condition – Terminal Diagnosis with 18 months or less life expectancy.
　☐ Debilitated Medical Condition – Illness that has you partially (50%) or completely (100%) disabled.

☒ Elderly Inmates with a Medical Condition:
　☐ "New Law" Elderly Inmates – Have to have served 30 years of a sentence.
　☒ Elderly with Medical Conditions – 65 yrs. old or older, a deteriorating medical condition, served 50% of your sentence.

☐ Elderly Inmates without a Medical Condition: - 65 yrs. old or older, Served 10 yrs. or 75% of your sentence (which is greater)

☐ Death or Incapacitation of the Family Member Caregiver of an inmate's dependent child: -provide verifiable documentation the child is "suddenly" without a caretaker, the family member is in an incapacitated state and is unable to care for the child.
☐ Incapacitation of a Spouse or Registered Partner: -Provide verifiable medical documentation of incapacitated state.

☐ Other:-Extraordinary and Compelling Circumstance

## To be filled out by Inmate:

Briefly describe your medical condition or extraordinary and compelling circumstance: Under U.S.S.G. § 5G1.3(b)(i) I have served 32 years prior to coming to the BOP in 2016 on my current case. Fixed & discrepancy that showed an area of interest for prostate cancer. Two Nurses at Hazelton lied in my medical records saying I refused treatment. My father died of prostate cancer. My left leg is deteriorating I can barely walk, I have hypertension, severe arthritis in shoulders.

If you have applied before, has anything changed in your medical condition since your last application? PSA is 5.47

Proposed Release Plan (**must have ALL of the following**):

Name and contact information of who you will live with: Ebony Doyle (773) 450-3834

When was the last time you spoke to this person concerning your release plan? Jan. 2022

Is this person willing to care for you? Yes

Address of where you will be living: 1721 E. 84th ST. Chicago, IL. 60617

Where will you receive your medical treatment (if applicable)? _____

How will you pay for your treatment (if applicable)? Medicare /Medicade

Additional Comments: I supposed to get an MRI on my Prostate and have a never doctor look at my left leg, a MRI on my left leg also. The Nurses lied at Hazelton, saying they told me of the harm and/or death if I refuse treatment. My provider order a Microalbumina Creatinine; Urine Random, and Urinalysis w/Microscopic Reflex tests. Both Nurses signed saying that I releave the BOP of responsibilty. This is not true.

Rev 4/20

Before completing this application, please review Program Statement 5050.50, Compassionate Release/Reduction in Sentence (RIS), available in the law library.

**If the inmate has not provided adequate information and documentation as set forth on this form and in P.S 5050.50, the Warden may deny the inmate's request at the institution level.**

## For Staff Use Only:

Before completing this review, please read Program Statement 5050.50, Compassionate Release/Reduction in Sentence (RIS), updated January 17, 2019. Please note that inmates should, under most circumstances, request a RIS in writing before an eligibility review is completed. Inmates may qualify for a RIS under several categories as outlined below:

MEDICAL WITH A TERMINAL DIAGNOSIS (Category: Med Terminal)
1. Does the inmate have a documented medical diagnosis from a physician with a prognosis of life expectancy of 18-months or less?
Yes No
If yes, list the terminal diagnosis. If no, inmate does not qualify under this category.

---

MEDICAL WITH A NON-TERMINAL DIAGNOSIS (Category: Med Non-Terminal)
1. Does the inmate have a documented medical diagnosis of an incurable, progressive illness or has the inmate suffered a debilitating injury from which he/she will not recover?
Yes No

2. AND, is the inmate completely disabled, unable to perform activities of daily living and totally confined to a bed or chair OR is the inmate only capable of limited self-care and confined to a bed or chair more than 50% of waking hours?
Yes No

If "Yes", list the medical diagnosis. If "No" is checked for either of the above items the inmate does not qualify under this category.

---

INMATES AGE 65 OR OLDER WITH A MEDICAL CONDITION (Category: Elderly Med Condition/65/50%)
1. Has inmate served at least 50% of their sentence? (If no, inmate does not qualify under this category. If yes, proceed.)
Yes No

2. Does inmate suffer from a documented chronic or serious medical condition?
Yes No

3. Has the inmate experienced a deteriorating mental or physical health condition that substantially diminishes his/her ability to function in a correctional environment?
Yes No

4. Will conventional treatment provide a substantial improvement to the inmate's mental or physical condition? (If yes, inmate does not qualify under this category)
Yes No

If "Yes" on item 2 or 3, list the condition. (Either item 2 or 3 above must be checked "Yes" for inmate to qualify under this category.)

---

INMATES AGE 65 OR OLDER REGARDLESS OF MEDICAL CONDITION (Category: Elderly Other/65/75%)
1. Has inmate served the greater of 10 years or 75% of their term of imprisonment to which they were sentence? (If no, inmate does not qualify under this category)
Yes No

CAREGIVER (Non-Med Caregiver)
If an inmate is applying for a RIS due to the death or incapacitation of their child's caregiver or the incapacitation of their spouse or registered partner, refer him/her to PS 5050.50 for the required documentation. Staff are not responsible for gathering the inmate's supporting documentation.

Rev 4/20

Government Exhibit 7

## Sheila Jackson Statement

On January 22, 1983 I was 17 years old, still really just a baby. I planned to go skating that afternoon with my friends near 95th Street and S. Eggleston Ave. Before I went, at about 4:00 p.m. I walked down to the Kentucky Fried Chicken to get my grandmother and myself something to eat. I saw two of my friends, Ann Quinn and Lynn Nathan, sitting in a white Cadillac parked in front of Champs Pool Hall on 43rd Street. A guy named Bear, who I hardly knew, was behind the wheel and Lynn, who was 21 years old, was in the back seat behind him. Ann, who was 20 years old, was in the front passenger's seat and asked me if I wanted to ride down the street with them. I said ok and got in the rear passenger seat. Bear drove us to 5640 S. Michigan Ave. and parked on the west side of the street facing south. He got out of the car and went into a large courtyard building next to where we parked.

Lynn, Ann, and I stayed in the car talking and listening to the radio for about 20 to 30 minutes. Lynn and I were facing each other and Ann was turned part way around so she could see and talk with us in the back seat. I then saw a green car pull up next to us. A man wearing a ski mask leaned out of the car and I heard shots. I looked at Lynn sitting right next to me and there was blood pouring out of her face like a water fountain from where she had been shot through her cheek. Ann went down on the floor while I tried to get out the back door. When I reached to open the door I was shot through my right forearm. I grabbed my arm and ducked down while Lynn sat there getting shot. I could hear the glass in the car windows shattering from the bullets. Ann managed to roll out the front door into the gutter. The shooting stopped and I could hear the squeal of the tires as the car sped away. Then came a bunch more gun shots real close together, and I was shot in my right leg and stomach. I saw Lynn trying to shield herself with her hand during the second shooting. When I finally got the door open and tried to get out of the car I couldn't walk because of my leg and stomach. Ann and I were both screaming over and over and holding each other.

I have never really recovered from the shooting. I still have PTSD when a car pulls up next to me or even slows down near me. I was unable to ride in cars for years afterwards and still get very anxious when I do. Because I had such major surgery after being shot in the stomach, I couldn't have children for many years. My arm and leg and stomach still hurt all the time, and I can't use my arm to lift or hold anything, including my grandchildren.

In the 1990s, I testified several times against the men who shot me and murdered Lynn. I was very glad to know that they were sentenced to life in prison. I have been told that one of them, J.L. Houston, is trying to get out of prison because of the COVID virus. I don't want that to happen. I am still very afraid of him, and my children are too.

2-24-21    1:15 pm

Date

Sheila Jackson

Sheila Jackson